NOT FOR PUBLICATION (Doc. No. 68)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| JOSEPH MEEHAN, : | |
| Plaintiff, : | |
| v. : | Civil No. 12-4079 (RBK/KMW) |
| ERIC TAYLOR, et al., : | OPINION |
| Defendants. : | |

**KUGLER**, United States District Judge:

This matter comes before the Court on the motion of Defendants for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Doc. No. 68). The subject of this motion is Plaintiff's Amended Complaint, in which he alleges violations of Federal and state laws against Defendants, based on an injury he suffered while in custody at the Camden County Correctional Facility. For the reasons stated herein, Defendants' motion will be granted.

## I. FACTUAL BACKGROUND[1]

On February 17, 2011, Plaintiff Joseph Meehan ("Plaintiff") was arrested for a parole violation by certain members of the U.S. Marshalls Service in Pennsauken, New Jersey. (Defs.' Statement of Undisputed Material Facts ("Defs.' SMF") ¶¶ 1, 10.) That same day he was admitted to the Camden County Correctional Facility ("CCCF") as a pretrial detainee, and

---

[1] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

charged with drug distribution, possession and distribution in a school zone and receiving stolen property, as well as a parole violation. (Id. ¶¶ 13-14.) Plaintiff was detained at the CCCF at all times relevant to this matter.

According to Plaintiff, during his arrest, one of the U.S. Marshals kicked a pair of crutches out from under Plaintiff's arm, which caused him to fall to the ground. (Id. ¶¶ 2, 11.) At that point, the U.S. Marshals repeatedly stomped on his left foot, which was already "swollen and injured." (Id. ¶¶ 2, 10, 12.) An x-ray of his left foot, taken later that day on February 17, 2011, showed a fracture. (Id. ¶ 15.) Plaintiff subsequently underwent surgery on his left foot on March 3, 2011, at Millennium Surgical Center, and was returned to CCCF. (Id. ¶ 16.)

Several months later, on July 25, 2011, Lt. Christopher Foschini ("Foschini"), the Unit Commander for Internal Affairs at CCCF, received a handwritten note authored by inmate Frank Batten, who was housed in the same unit as Plaintiff. (Id. ¶ 17.) Inmate Batten's note stated that two of CCCF's transport officers were in "great danger" because there was an "escape plan in motion" on an approaching medical trip. (Id. ¶ 18.) After receiving the note, Foschini met with inmate Batten, who reported what Plaintiff had said to him—that he was going to be transported to a doctor's office for a foot examination and treatment, and while at this location, he was going to escape by using force against an officer, and certain unknown persons on the outside would be waiting for him. (Id. ¶ 19.) Inmate Batten also told Foschini that Plaintiff was in possession of two shanks, one of which he kept inside his foot brace, and the other he kept inside his cell. (Id. ¶ 20.)

As a result of this information, Foschini immediately notified Warden Eric Taylor ("Taylor") and Captain Michael Murphy ("Murphy"), and Murphy ordered a search of the medical unit. (Id. ¶ 21.) In Plaintiff's cell, Officer Louis Kaelin found a seven inch sharpened

2

piece of metal with a piece of cloth wrapped around it, acting as a handle, inside Plaintiff's personal belongings.  (Id. ¶ 24.)  During his search of Plaintiff, in a separate cell, Officer Kenneth Sweeten ("Sweeten") found an eight and one-half inch sharpened piece of metal inside the Plaintiff's air cast.  (Id. ¶ 22.)

The parties disagree over the details of what happened when Sweeten searched Plaintiff's medical boot for the weapon, CCCF's policies, or lack thereof, regarding how officers were to conduct a search of inmates with medical devices, and any grievance records submitted by Plaintiff.

Plaintiff contends that, on July 25, 2011, Sweeten forcibly removed him from his wheelchair while he was in his cell and dragged him into an adjoining cell.  (Ex. A to Pl.'s Opp'n, Joseph Meehan Deposition Testimony ("Meehan Dep.") at 67:6-10.)  While Plaintiff was held from behind, Sweeten then violently ripped Plaintiff's air cast off his leg from the front.  (Id. at 70:15-21, 71:11-13.)  After finding the shank inside Plaintiff's cast, Sweeten asked Plaintiff if he was going to use it to "stab a cop," and proceeded to use his boot to stomp on Plaintiff's injured left foot.  (Id. at 67:21-25, 71:7-10.)  Following this incident, Plaintiff was placed into an isolation cell.  (Id. at 73:19-21.)  Despite Sweeten's alleged actions, Plaintiff admits that he suffered no additional broken bones in his foot. (Defs.' SMF ¶ 28; Pl.'s Response to Defs.' SMF ¶ 28.)

Conversely, Defendants assert that Sweeten had Plaintiff remove his own cast, at Sweeten's direction.  (Ex. B to Pl.'s Opp'n, Kenneth Sweeten Deposition Testimony ("Sweeten Dep.") at 30:7-13, 32:8-33:14.)  They claim Sweeten never forcibly removed Plaintiff from his wheelchair, or stomped on Plaintiff's foot after his cast had been removed.  (Id. at 53:17-25.)  Rather, after Plaintiff had removed his cast and Sweeten had secured the knife, Sweeten

proceeded to have Plaintiff remove each item of clothing he was wearing to be searched for any additional weapons, prior to being placed into the isolation cell. (Id. at 33:15-24.)

According to Sweeten, he was unaware of any policy which prohibited corrections officers from removing medical devices, but he did not recall receiving any formal training regarding how to remove such devices. (Id. at 26:4-7, 26:13-16.) Prior to the removal of Plaintiff's air cast, Sweeten did not ask Plaintiff why he had the cast on, and he had no knowledge concerning Plaintiffs prior injury. (Id. at 40:23-25, 41:9-11, 42:12-15.) He also admitted that it would have been logistically possible to have a medical staff member remove the air cast, had Plaintiff been restrained, but Sweeten claimed he did not do so because "there was a potential of a shank and … I'm not going to have anybody in there." (Id. 39:13-24.) Deputy Warden Christopher Fosler also testified that the removal of medical devices during inmate searches at CCCF, and the need for medical staff to assist, was dealt with on a case-by-case basis, and is left up to the Officers conducting the search. (Ex. D to Pl.'s Opp'n, Christopher Fosler Deposition Testimony ("Fosler Dep.") at 51:14-52:10 ("If it's an emergent case, [the decision as to how to remove the medical device is left up to the officer]").)

While Plaintiff had previously relied on the use of inmate grievance forms for filing grievances, (see Ex. I to Defs.' Br, CCCF Inmate Grievance Procedure and Inmate Meehan Grievance Records ("Grievance Procedure" and "Grievance Records," respectively)), he claims he was not provided with a grievance form after he requested one on July 25. (Meehan Dep. at 114:6-18.) Instead, within days of the incident, Plaintiff apparently sent "grievance" letters to Taylor and CCCF Nurse Melanie Julie ("Julie"). (Ex. E to Pl.'s Opp'n, Letters to Warden Taylor and Nurse Julie ("Taylor Letters" and "Julie Letter," respectively).)[2] Plaintiff's letter to Julie,

---

[2] While there are two letters addressed to Taylor included in Exhibit E, Plaintiff's deposition testimony indicates that the second, printed letter (stamped with the word "Received" in reverse), was the only letter actually sent to Taylor

4

dated July 27, 2011, was titled "Grievance Form" and mentions that "[t]he E.T.V. team (c/o Sweeton & his band of corrupt cops) smashed [Plaintiff's] already injured left foot while shaking down." (Julie Letter.) In that letter he went on to complain that he had submitted other grievance letters to Julie requesting medical treatment, yet the medical staff continued to refuse to look at or treat his injury. (Id.) In his July 31, 2011, letter written to Taylor, Plaintiff complained that inmate Batten had lied about the alleged escape plan, and was trying to extort certain inmates. (Taylor Letters.) Plaintiff also protested that he did not have access to a pen to write and sign "legal documents." (Id.) Defendants admit that Plaintiff sent Taylor a letter, but deny receiving the letter addressed to Julie. (Defs.' Response to Pl.'s Statement of Undisputed Material Facts ¶ 26.)

CCCF's inmate handbook provides that "[a] grievance may be initiated for … a. An alleged violation of civil, constitutional or statutory right or policy." (Grievance Procedure.) Importantly,

> 8. Inmates are encouraged to resolve grievances informally by voicing their grievances to any staff member. … When presented with an informal grievance, the staff member may initiate corrective action if the action is within the normal scope of the employee responsibility. However, if the inmate grievance is beyond the scope of the staff member, he shall notify their supervisor as soon as practical. All reasonable steps will be taken to resolve the grievances informally within the approved discretion

---

by Plaintiff. (See Meehan Dep. 116:12-117:14 (describing the first letter, titled "Exhibit A," to be a rough draft of the letter actually sent to Taylor).) Because the one letter submitted to Taylor is the only letter relevant for purposes of determining whether Plaintiff complied with the grievance procedures, all further references to the "Taylor Letters" relate only to the language in the second letter.

The Court also notes that the document included in Exhibit E, titled "Statement of Facts," was apparently never submitted to CCCF officials, and is not properly considered as evidence of Plaintiff's attempts to file grievance reports. (See Meehan Dep. 85:7-9, 89:4-90:2, 90:21-91:8 (indicating that the document labeled "Statement of Facts" was prepared around the time of the incident, as was the draft letter written to Taylor, labeled "Exhibit A").) While Plaintiff may have written this detailed document shortly after the incident which precipitated this matter, there is no testimony or evidence suggesting that CCCF officials ever received this information prior to the filing of Plaintiff's lawsuit.

5

>of the Shift Commander. If the matter cannot or should not be resolved the inmate may initiate a formal grievance.
>
>9. An inmate at [CCCF] may file a formal, written grievance anytime within 15 days after any event has occurred where a grievance may be warranted. … [T]he inmate may use plain paper, if no grievance forms are available. If a plain piece of paper is used, the paper should be clearly labeled "<u>inmate grievance</u>" near the top, informing the grievance officer of the formal grievance. …
>
>10. All grievances will be collected daily and time stamped and logged by the Department's Grievance Officer. The grievance officer will review all grievances to assure that the complaint can be grieved.
>
>11. If the grievance meets our guidelines, it will be forwarded to the appropriate Shift Commander for possible resolution within 72 hours of an investigation.
>
>12. If the grievance is not resolved in 72 hours it will be return [sic] to the grievance officer for review and resolution within 10 days. If the inmate is not satisfied with the grievance officer's decision, He/She may appeal to the Warden (or his designee) in 10 days in writing.

(<u>Id.</u>)

On July 2, 2012, Plaintiff filed his Original Complaint, and on December 20, 2012, Plaintiff filed an Amended Complaint against Taylor, Foschini, Sweeten, Julie, CCCF, the State of New Jersey Department of Corrections, Camden County, the United States of America, John Does I-V, and Jane Does I-V (Doc. No. 37). In his Amended Complaint Plaintiff alleges that all Defendants engaged in conduct against Defendant constituting: cruel and unusual punishment, in violation of the New Jersey State Constitution (Count I); cruel and unusual punishment, in violation of the Federal Constitution (Count II); recklessness or gross negligence, in violation of New Jersey law (Count VI); a violation of 42 U.S.C. § 1983 (Count VII), and; a violation of 42 U.S.C. § 1985 (Count VIII). Additionally, Plaintiff alleged a state law claim for intentional torts (Count III) against Defendants Taylor, Foschini, Sweeten, and the unnamed John and Jane Does;

6

a state law claim for negligence (Count IV) against Defendants Foschini, Sweeten, Julie, and the unnamed John and Jane Does; a state law claim for negligent supervision (Count V) against Defendants Taylor, CCCF, Camden County, the State of New Jersey Department of Corrections and the United States of America, and; a claim arising under the Federal Tort Claims Act (Count IX) against Defendants Taylor, Foschini, Sweeten, Julie, and the unnamed John and Jane Does.

On February 28, 2013, this Court entered a stipulation and order of dismissal for Defendant CCCF (Doc. No. 51), and on March, 19, 2013, this Court did the same for Defendant Julie (Doc. No. 56). Then on August 26, 2013, this Court issued an order dismissing Plaintiff's claims against the United States of America for lack of jurisdiction (Doc. No. 62). The remaining Defendants filed this present motion for summary judgment on April 4, 2014. Plaintiff apparently does not contest Defendants' motion with respect to Defendants Taylor, Foschini, and the State of New Jersey Department of Corrections, (see Pl.'s Opp'n at 1), so the Court will dismiss all claims against those Defendants.[3] In fact, Plaintiff only opposes Defendants' motion for summary judgment as it relates to his § 1983 claim against Defendants Sweeten and Camden County (Count VII), and his claims for intentional torts and recklessness and gross negligence against Defendant Sweeten (Counts III and VI). (Id. at 7-17.) Accordingly, the Court will also dismiss Counts I-II, IV-V, and VIII-IX against Sweeten and Camden County, as well as Count VI against Camden County. As discussed herein, because

---

[3] "Although '[u]se of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified,' these parties must be dismissed if such discovery does not reveal their proper identities." Cordial v. Atl. City, No. 11-1457, 2014 WL 1095584, at *3 (D.N.J. Mar. 19, 2014), recons. den., 2014 WL 2451137 (D.N.J. June 2, 2014) (citing Blakeslee v. Clinton Cnty., 336 F. App'x 248, 250 (3d Cir. 2009) (affirming district court's sua sponte dismissal of fictitious parties that were not identified after discovery)). "This may be done upon motion of a party or the Court." Id. (citing Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.")). Here, Plaintiff has failed to amend his Complaint or otherwise identify any of these fictitious defendants despite the fact that discovery has now closed. Thus, these parties shall be dismissed.

Plaintiff failed to exhaust his administrative remedies, his § 1983 claims will be dismissed pursuant to 42 U.S.C. § 1997e(a), and the Court will dismiss his remaining state law claims.

## II. LEGAL STANDARD

The Court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. Anderson, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in its favor. Id. at 255; Matsushita, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. Anderson, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which the jury might return a verdict in his favor. Id. at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III.  DISCUSSION

Defendants contend that, because Plaintiff did not exhaust his administrative remedies regarding his § 1983 claims for cruel and unusual punishment or municipal liability, his remaining federal claims must be dismissed pursuant to the Prison Litigation Reform Act.  See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); see also Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Prisoners must now exhaust all 'available' remedies.")  Plaintiff claims his letters to Taylor and Julie were sufficient to exhaust his administrative remedies.

Whether Plaintiff properly exhausted his claim is a determination made by evaluating compliance with CCCF's specific grievance procedures.  Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010).  Additionally, "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements and not the PLRA, that define the boundaries of proper exhaustion."  Jones v. Bock, 549 U.S. 199, 218 (2007).  While the Third Circuit has yet to address the issue of the specificity with which a prisoner must present an administrative grievance in a comprehensive manner, it has noted generally that "[t]he primary purpose of a grievance is to alert prison officials to a problem."  Williams v. Beard, 82 F.3d 637, 640 (3d Cir. 2007) (internal quotation marks omitted) (quoting Jones v. Bock, 549 U.S. 199, 219 (2007)).  Such language has led at least one court in this District to embrace the standard adopted by six circuit courts: that a grievance "suffices if it alerts the prison to the nature of the wrong for which redress is sought."  Olivares v. United States, No. 07–3476, 2010 WL 5251429 at *4 (D.N.J. Dec. 15, 2010) (citing

Griffen v. Arpaio, 557 F.3d 1117 (9th Cir.2009)) (quoting Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002) (collecting cases from the Second, Fifth, Sixth, Seventh, Ninth, and Tenth Circuit Courts)). Under this interpretation, the Court looks to the grievances filed by Plaintiff to determine whether they provided CCCF with sufficient notice of the "nature of the wrong" for which Plaintiff now seeks redress. See Olivares, 2010 WL 5251429 at *4.

First, the Court notes that Plaintiff did not follow or exhaust the available grievance procedures available to inmates at CCCF. Plaintiff's official grievance record contains no records of grievances submitted on or after July 25, 2011. (See Grievance Record.) Instead, Plaintiff apparently submitted letters, which he claims were sent to Warden Taylor and Nurse Julie at CCCF on July 31 and July 25, 2011, respectively. Plaintiff attempted to file a grievance "informally," by use of a plain sheet of paper labeled "Grievance Form," but he did not properly submit his letters according to CCCF's grievance procedures. According to the CCCF Grievance Procedure, where inmates first attempt to address their grievances informally, they may always also submit formal, written grievances. (Grievance Procedure ¶¶ 8-9.) This includes writing out a grievance on plain white paper, if no grievance form is available. (Id. ¶ 9.) To submit a formal grievance on his own paper, Plaintiff was also required to title the paper "inmate grievance," in order to "[inform] the grievance officer of the formal grievance." (Id. (emphasis added).) Then, any formal grievances were collected daily and logged by the "Department's Grievance Officer." (Id. ¶ 10 (emphasis added).) Though Plaintiff construes his letters as informal communications, the use of the words "Grievance Form" at the top of his letter to Julie indicates some intent to file a formal grievance.[4] Plaintiff did not, however, submit this grievance letter to a Grievance

---

[4] Plaintiff did not add any heading to his letter(s) addressed to Taylor, and only mentions "the incident that took place on 7-25-11." (See Taylor Letters.)

10

Officer.[5] Even if Plaintiff believed he was in fact attempting to resolve his grievance informally, he did not follow his letters to Taylor or Julie up with any formal grievance submission, as detailed in paragraph 9 of the grievance procedures. See Spruill v. Gillis, 372 F.3d 218, 227 (3d Cir. 2004) ("In Nyhuis, 204 F.3d 65, we held that an inmate seeking relief that the prison's administrative grievance system cannot provide (in Nyhuis, it was money damages) must nonetheless pursue the grievance process to its end before coming to federal court. We concluded that the PLRA 'make[s] exhaustion of all administrative remedies mandatory.'") (emphasis in original). The Court does not find that Plaintiff exhausted his administrative remedies within the parameters of what was made available to him in the CCCF Grievance Procedure.

Secondly, even assuming Plaintiff properly exhausted all of his available administrative remedies for filing grievances, his two letters do not contain enough factual specificity to "[alert] the prison to the nature of the wrong" for which Plaintiff sought redress. (Griffin v. Arpaio, 447 F.3d 1117, 1120 (9th Cir. 2009); see also Williams, 482 F.3d at 640. The letter addressed to Taylor did not address any conduct related to Plaintiffs' § 1983 claim for cruel and unusual punishment or municipal liability. Instead it mentioned an alleged scheme by inmate Batten, claimed Plaintiff possessed the prohibited knives for "personal protection," and complained of his lack of a pen with which to write certain legal documents. (See Taylor Letters.) There is no mention in that letter of the supposed injury to Plaintiff's foot caused by Sweeten or any defective policies or procedures which could establish municipal liability. Plaintiff also attached

---

[5] Plaintiff acknowledged in his letter to Julie that he had previous submitted his grievances to a "grievance coordinator," but asserted that those grievances were merely being thrown away once they were forwarded to Julie. (See Julie Letter.) Regardless of Plaintiff's accusations concerning what happened to the grievances he had supposedly previously submitted, this statement indicates that Plaintiff was aware of the process in place for submitting formal grievances.

11

a letter that he allegedly wrote to Julie, which was primarily a complaint about the lack of medical treatment he had received following the incident.  (See Julie Letter ("I sent you a grievance yesterday … in regards to the incident and your staff has continuously refused to treat my injury. … You need to fire Dr. Pomerantz, but on the other hand, your [sic] responsible for the doctors under you, your [sic] the boss!").)  In that letter he also mentions that Sweeten "smashed [Plaintiff's] already injured left foot while shaking down [Plaintiff]," as the cause of the pain in his left foot.  (Id.)  In the context of a letter addressed to Julie, a member of the CCCF medical staff, primarily concerning the lack of medical treatment Plaintiff was receiving for his sore foot after the incident, the Court finds that this single reference to the actions of Sweeten was insufficient to alert CCCF officials to a possible Eight Amendment claim.  Nor do Plaintiff's complaints about deficient medical treatment bear on the municipal liability claim against Camden County, as they do not mention any details concerning the alleged improper actions taken by Sweeten in removing Plaintiff's medical device during the search.  Plaintiff makes no mention of the Eight Amendment, his constitutional rights, or even any allegedly illegal or wrongful actions on behalf of Defendants.  It is entirely possible that the injury complained of was caused during the course of a lawful "shake down," and Plaintiff does not suggest otherwise in this letter.  See Olivares, 2010 WL 5251429 at *6 ("The point of the grievance is to alert prison officials to a problem, so they have an opportunity to correct it.  The wrong to which a prisoner must alert the prison officials cannot be construed so broadly as to undermine the basic purpose of the grievance process.") (internal citations omitted) (citing Jones, 549 U.S. at 218; Williams, 482, F.3d at 640).  Considering the evidence in the light most favorable to him, the Court concludes that the letters submitted by Plaintiff could not reasonably be construed as alerting CCCF of claims for cruel and unusual punishment or municipal liability under § 1983.

Because Plaintiff failed to exhaust his administrative remedies, his § 1983 claims against Defendants Sweeten and Camden County, in Count VII of the Amended Complaint, will be dismissed pursuant to § 1997e(a).  Counts III and VI against Defendant Sweeten will also be dismissed.[6]

## IV.  CONCLUSION

For the reasons expressed above, Defendants' motion for summary judgment will be **GRANTED**.  All claims against all remaining Defendants will be **DISMISSED**.  An appropriate Order shall enter.

Dated:  11/5/2014                                   s/ Robert B. Kugler    _____
                                                                ROBERT B. KUGLER
                                                                United States District Judge

---

[6] It is generally established in the Third Circuit that a court may decline supplemental jurisdiction when federal claims are dismissed by way of summary judgment.  Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir. 1976) ("if it appears that the federal claim . . . could be disposed of on a motion for summary judgment under F.R. Civ. P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances"); Simmerman v. Corino, 804 F. Supp. 644, 658 (D.N.J. 1992) ("[W]here a party's federal claims are disposed of on a summary judgment motion, the court should generally refrain from exercising supplemental jurisdiction over the remaining state claims."), aff'd, 16 F.3d 405 (3d Cir. 1993).  Because this Court grants summary judgment in favor of Defendants on all federal claims, the Court declines to exercise supplemental jurisdiction over all remaining state law claims and is therefore dismissing them.